# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| DREAMPAK, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:18 C 3396 |
| | ) | Hon. Marvin E. Aspen |
| INFODATA CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

MARVIN E. ASPEN, District Judge:

Plaintiff DreamPak, LLC filed this lawsuit against Defendant InfoData Corporation alleging breach of contract (Count I), fraudulent concealment (Count II), and negligent misrepresentation (Count III).  (Compl. (Dkt. No. 1) ¶¶ 55–80.)  Before us is Defendant's motion to dismiss the complaint pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6). (Mot. (Dkt. No. 13) at 2.)  Defendant also moves to strike portions of the complaint pursuant to Rule 12(f).  (*Id.*)  For the reasons set forth below, we grant in part Defendant's motion to dismiss Count I for breaches of contract that occurred before May 11, 2017, and deny in part Defendant's motion for breaches after May 11, 2017; grant Defendant's motion to dismiss Counts II and III, without prejudice; and deny Defendant's motion to strike portions of the complaint.

## BACKGROUND

For purposes of a motion to dismiss, we accept all well-pleaded factual allegations as true and draw all reasonable inferences in favor of the plaintiff.  *Katz-Crank v. Haskett*, 843 F.3d 641, 646 (7th Cir. 2016).  Plaintiff, a Virginia limited liability company, manufactures beverage enhancers, milk modifiers, and dietary supplements.  (Compl. ¶ 1.)  Defendant, an

Illinois software sales and consulting company, is "an expert in the implementation of Enterprise Resource Planning ('ERP') software." (*Id.* ¶¶ 4, 10.) ERP software provides companies with an integrated technology solution to view and manage their core business functions. (*Id.* ¶¶ 10, 11.) In early 2015, Plaintiff sought to purchase and implement an ERP software system and received a referral to approach Defendant for the task. (*Id.* ¶¶ 14, 15.) Plaintiff "had a number of discussions with InfoData regarding the scope of the ERP project, DreamPak's goals and needs, and InfoData's qualifications and experience with ERP software systems and the Sage X3 system, in particular." (*Id.* ¶ 15.) Before contracting with Defendant, the parties met and Plaintiff "explicitly informed" Defendant of Plaintiff's required capabilities, most importantly a material requirements planning ("MRP") feature that would aid Plaintiff's production planning, scheduling, and inventory control. (*Id.* ¶¶ 16, 17.) Defendant assured Plaintiff repeatedly that it was "capable of implementing ERP software that met each of [Plaintiff's] stated needs." (*Id.* ¶ 18.) Based on Defendant's representations, Plaintiff agreed to purchase a Sage X3 ERP system from Defendant and to retain Defendant to implement the software. (*Id.* ¶ 19.)

The parties executed a Software Services Agreement ("SSA") on September 21, 2015. (*Id.* ¶ 20; SSA (Dkt. No. 1–1).) The SSA described Defendant's obligations to provide and implement an ERP system for Plaintiff with a series of agreed-upon "modules," such as customer service, quoting, forecasting, job orders, budgeting, and allergen tracking, among several others. (Compl. ¶ 22.) The SSA stated that estimated timelines for project completion and services rendered "are provided solely as a general guideline for the Client," but that Defendant would "furnish upon Client's written request a written status and progress report" and, also upon written request, would "notify the Client as soon as is practical, if it appears that the estimate with respect to the amount of services will be exceeded." (*Id.* ¶ 27.) Plaintiff ultimately paid

$82,178.00 for the software package, including the software license fee, taxes, and ancillary charges. (*Id.* ¶ 24.) The SSA stipulated that no action arising from the agreement could be brought "more than one year after the cause of action has accrued." (SSA at 4.)

In addition, also under the SSA, Plaintiff agreed to purchase from Defendant a "consulting package for the implementation of the ERP software." (Compl. ¶ 25.) The package would consist of 55 days' worth (in aggregate hours) of "application consulting," to include "Sage X3 installation, project management, and training," for an additional $85,250.00 (ultimately $90,560.16 with all charges included). (*Id.* ¶¶ 25, 33.)[1] The consulting agreement said Defendant would track all of its time assisting Plaintiff and would "provide [DreamPak] with a monthly summary, if requested, so that [DreamPak] can manage [its] consulting investment." (*Id.* ¶ 29; SSA at 3.) Plaintiff agreed to purchase the consulting based on Defendant's assurances that 55 days of time would be "sufficient to fully implement the Sage X3 Software" to Plaintiff's specifications. (Compl. ¶ 27.)

Despite Plaintiff's attempts to have Defendant put a project plan in writing, Defendant provided Plaintiff with no updates for months after the SSA was signed and asserted that it needed more information on Plaintiff's processes before producing a written project timeline. (*Id.* ¶ 30.) Defendant did eventually visit Plaintiff's premises to provide guidance on implementing and using the ERP system, and Defendant produced a proposed project plan and scope of work on March 29, 2016, which Plaintiff approved. (*Id.* ¶¶ 31, 32.) In September 2016, Plaintiff's Vice President of Operations, hearing no news, emailed Defendant's in-house

---

[1] The consulting agreement, executed as a "Letter of Understanding" and attached as Exhibit C to the SSA, provides that the scope of services would include, but were not limited to, "Project Management to assist in setting up work plans, attending meetings, and informing [DreamPak's] management of the status of the Project," and "Manufacturing and Financial Consulting that will assist [DreamPak] in applying Sage X3 to [DreamPak's] business." (SSA at 3.)

accountant to request a status update, including days already worked and, going forward, a biweekly "breakdown" of "how many hours have been worked." (*Id.* ¶ 36.) Plaintiff received no response to its September missive. (*Id.* ¶ 37.) Plaintiff sent two follow-up email requests in November 2016, which were again met with silence, and another on February 15, 2017, which garnered a response the following day, February 16, 2017. (*Id.* ¶¶ 38, 39.) Defendant informed Plaintiff that, "after going through the hours," 61.5 hours of implementation time remained on the original 55-day consulting agreement. (*Id.* ¶ 39.) One month later, Defendant had done no additional work. (*Id.* ¶ 40.) Plaintiff's Vice President of Operations again asked for an update in early May. (*Id.* ¶ 41.) On May 19, 2017, Defendant responded that only 18.5 hours remained on Plaintiffs' pre-paid consulting package as of the end of April 2017, and that Defendant would update Plaintiff the following week with work completed during May. (*Id.* ¶ 42.)

On May 24, 2017, Defendant informed Plaintiff that it had exhausted the 55-day consulting package. (*Id.* ¶ 43.) Defendant estimated that an additional 19 consulting days would be required to finish the project as originally planned, at an approximate added cost of $36,000.00. (*Id.*) "[A]round this same time," Defendant "attempted to unilaterally change the scope of the project," advising Plaintiff that it would not implement certain ERP functionalities, including the MRP module, during "phase one" of the project. (*Id.* ¶¶ 44, 50.) Plaintiff alleges the executed SSA did not divide the project into phases and that the parties had never discussed staggering the implementation or delaying the installation of any required features to a later phase. (*Id.* ¶ 45.) Plaintiff objected to this unilateral change, as it had "agreed to purchase the software and associated consulting package precisely because Defendant promised to implement each of the modules identified in the [SSA]." (*Id.* ¶ 48.) Throughout May and June 2017, Plaintiff attempted to work with Defendant to salvage a plan to implement the ERP system that

4

included all components.  (*Id.* ¶ 49.)  On June 27, 2017, Defendant reiterated it would require 19

additional days of non-technical consulting work to complete "phase one."  (*Id.* ¶ 50.)  The new

proposal did not specify which modules would be completed in "phase one" or deferred to a later

"phase two."  (*Id.* ¶ 50.)  The parties continued to meet through September or October 2017 but

did not agree on a plan, and Defendant ceased working on the project.  (*Id.* ¶ 52.)  As of the

filing of this suit, Defendant had not fully implemented the Sage X3 ERP system, and Plaintiff

could not use Defendant's ERP software for any purpose.  (*Id.* ¶ 54.)  Plaintiff instead licensed

an alternative Sage ERP software package through another vendor, at an additional cost of

$33,000.  (*Id.*)

Plaintiff asserts claims for breach of contract, fraudulent concealment, and negligent

misrepresentation, (*id.* ¶¶ 55–79), and seeks damages for lost profits, lost productivity, costs, and

attorney's fees (*id*. ¶ 80).

## LEGAL STANDARD

"The purpose of the motion to dismiss is to test the sufficiency of the complaint, not

decide the merits."  *Gibson v. City of Chi.*, 910 F.2d 1510, 1520 (7th Cir. 1990) (internal

quotation marks omitted) (quoting *Triad Assocs., Inc. v. Chi. Hous. Auth.*, 892 F.2d 583, 586

(7th Cir. 1989)).  Dismissal pursuant to Rule 12(b)(6) is proper only if a complaint lacks enough

facts "to state a claim [for] relief that is plausible on its face."  *Ashcroft v. Iqbal*,

556 U.S. 662, 678, 129 S. Ct. 1937, 1949–50 (2009) (internal quotations omitted)

(quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007));

*accord Killingsworth v. HSBC Bank Nev., N.A.*, 507 F.3d 614, 618–19 (7th Cir. 2007).  The

plausibility standard "is not akin to a 'probability requirement,' but it asks for more than a sheer

possibility that a defendant has acted unlawfully."  *Iqbal*, 556 U.S. at 678, 129 S. Ct. at 1949

(quoting *Twombly*, 550 U.S. at 555, 127 S. Ct. at 1964–65). That is, while the plaintiff need not plead "detailed factual allegations," the complaint must allege facts sufficient "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 127 S. Ct. at 1964–65. Again, we accept as true all well-pleaded factual allegations and draw all reasonable inferences in favor of the plaintiff. *White v. Keely*, 814 F.3d 883, 887–88 (7th Cir. 2016); *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 334 (7th Cir. 2012) ("In reviewing the sufficiency of a complaint, we must accept all well pled facts as true and draw all permissible inferences in favor of the plaintiff.").

When a complaint alleges fraud, a heightened pleading standard applies, requiring a party to "state with particularity the circumstances constituting the fraud or mistake." Fed. R. Civ. P. 9(b). "This ordinarily requires describing the 'who, what, when, where, and how' of the fraud, although the exact level of particularity that is required will necessarily differ based on the facts of the case." *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 615 (7th Cir. 2011) (citing *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 441–42 (7th Cir. 2011)).

## ANALYSIS

### I.  STATUTE OF LIMITATIONS

Defendant moves to dismiss Plaintiff's claims on statute of limitations grounds. (Mot. at 2; Mem. in Supp. of Mot. to Dismiss ("Mem.") (Dkt. No. 14.) at 1, 3–4.) There is no dispute that the SSA limited the statute of limitations to one year after a claim accrues. (SSA at 4; Mem. at 3–4; Pl. Resp. to Mot. to Dismiss ("Resp.") (Dkt. No. 17) at 1.) A one-year statute of limitations is reasonable under Illinois law, which governs the SSA. (Mem. at 2; SSA at 6.) *Stephan v. Goldinger*, 325 F.3d 874, 877 (7th Cir. 2003); *Sears Home Appliance*

*Showrooms, LLC v. Charlotte Outlet Store, LLC*, No. 17 C 8478, 2018 WL 3068459, at *4 (N.D. Ill. June 21, 2018) ("Courts applying Illinois law have enforced one-year contractual limitations periods."). As Plaintiff's complaint was filed on May 11, 2018, any claims accruing before May 11, 2017 are time-barred.

For contracts and torts arising out of contractual relationships, the cause of action accrues at the time the contract is breached. *Hermitage Corp. v. Contractors Adjustment Co.*, 166 Ill. 2d 72, 77, 651 N.E.2d 1132, 1135 (Ill. 1995); *In re marchFIRST Inc.*, 589 F.3d 901, 903 (7th Cir. 2009). In Illinois, "the objective in interpreting a contract is to ascertain and give effect to the intent of the parties." *Gore v. Alltel Commc'ns, LLC*, 666 F.3d 1027, 1033 (7th Cir. 2012) (quoting *Carey v. Richards Bldg. Supply Co.*, 367 Ill. App. 3d 724, 727, 856 N.E.2d 24, 27 (2d Dist. 2006)). The most important consideration is the "objective manifestations of the parties, including the language they used in the contract." *Id.* (quoting *Carey*, 367 Ill. App. 3d at 727, 856 N.E.2d at 27). Where the language is clear, we will enforce the contract as written. *Id.*

Plaintiff claims that Defendant breached the SSA because Defendant did not track its time or update Plaintiff as requested on the implementation of the Sage X3 software, despite contract language that Defendant would "furnish upon Client's written request a written status and progress report," (SSA at 4), and, in the Letter of Understanding outlining the consulting services, that Defendant "tracks all time spent assisting clients" and would "provide you [DreamPak] with a monthly summary, if requested." (*Id.* at 3; *see also* Compl. ¶ 58.) Specifically, potential breaches include Defendant's silence in the five months following Plaintiff's September 2016 request for an update and biweekly breakdown of hours worked, (Compl. ¶¶ 36–38); Defendant's response on February 16, 2017, which indicated that Defendant

had not been keeping contemporaneous records of time worked, (*id.* ¶ 39); and Defendant's response on May 19, 2017 that it had tracked hours only through the end of April, (*id.* ¶ 42).[2]

Plaintiff also alleges that Defendant failed to implement the software system within a reasonable time and unilaterally changed the scope of the project by refusing to implement certain software modules, including MRP. (*Id.* ¶ 58.) The earliest the complaint alleges this potential breach is on or about May 24, 2017, when Defendant first communicated to Plaintiff that the 55-day consulting period had expired and that Defendant would not implement certain software functionalities without additional paid consulting time. (*Id.* ¶¶ 43, 44.)

Defendant argues that Plaintiff's claims for breach accrued no later than February 16, 2017 when, per the complaint, Defendant first admitted it had failed to track its time worked as Plaintiff requested. (Mem. at 4.) Because Plaintiff alleges that Defendant had breached at least one of its contractual obligations on that date, Defendant asserts that all subsequent claims for breach accrued at that same time, if not earlier. (*Id.*) Defendant argues that all claims thus fall outside the SSA's one-year statute of limitations since that date was more than one year before the May 11, 2018 complaint filing date. (*Id.*) Plaintiff, by contrast, contends that its breach-of-contract claim accrued, at the earliest, on or about May 24, 2017, thus falling within the limitations period. (Resp. at 3–4.)

Assuming Defendant's alleged failures to track its time or to update Plaintiff throughout 2016 and early 2017 were indeed breaches of the parties' contract, any claim that was actionable and known to Plaintiffs before May 11, 2017 is time barred. *See Hassebrock v. Ceja Corp.*,

---

[2] Defendant does not argue, and we do not decide, whether any of Plaintiff's allegations actually constitute breach of the SSA. Defendant's motion to dismiss attacks Plaintiff's claims on statute of limitations and other grounds, appearing to assume that Plaintiff's allegations, if true, would constitute breach. We likewise assume the allegations amount to breaches of the SSA only for the purpose of determining when the statute of limitations might accrue.

2015 IL App (5th) 140037, ¶ 35, 29 N.E.3d 412, 422 (5th Dist. 2015) ("Generally, the statute of limitations begins to elapse when facts exist which authorize the bringing of an action." (quoting *Skinner v. Shirley of Hollywood,* 723 F. Supp. 50, 54 (N.D. Ill. 1989)). The question becomes whether the statute of limitations begins to run against all future breaches once the first breach occurs.

In contracts where a condition is continuing or repeated, a series of partial breaches will each trigger their own limitations period. *Id.*; *Hi-Lite Prod. Co. v. Am. Home Prod. Corp.*, 11 F.3d 1402, 1408–09 (7th Cir. 1993) ("[B]ecause each breach of a continuous duty has its own accrual date, a plaintiff may sue on any breach which occurred within the limitation's period, even if earlier breaches occurred outside the limitation period." (citing 4 Corbin on Contracts § 956 at 841 (1951))). However, a continuous contract "is capable not only of a series of partial breaches but also a single total breach by repudiation or a material failure of performance." *Hi-Lite*, 11 F.3d at 1409. (*See also* Def.'s Reply in Supp. of Mot. to Dismiss ("Reply") (Dkt. No. 21) at 2 (quoting this language).) When a total breach or repudiation occurs, all claims under the contract accrue at that time. *Hassebrock*, 2015 IL App (5th) 140037, ¶ 35, 29 N.E.3d at 422; *Hi-Lite*, 11 F.3d at 1409. A total breach triggering the limitations period for all claims must be either a material breach, *i.e.* one "so substantial and fundamental as to defeat the objects of the parties in making the agreement," *Hassebrock*, 2015 IL App (5th) 140037, ¶ 36, 29 N.E.3d at 422 (quoting *Vill. of Fox Lake v. Aetna Cas. & Sur. Co.*, 178 Ill. App. 3d 887, 900, 534 N.E.2d 133, 141 (2d Dist. 1989)), or a repudiation of the contract. *See id.* (citing *Record v. Kempe*, 2007 VT 39, ¶ 15, 182 Vt. 17, 928 A.2d 1199 ("A party repudiates a contract when that party explicitly or implicitly represents that he cannot or will not perform his obligations under the contract.")); *Pope ex rel. Pope v. Econ. Fire & Cas.*

*Co.*, 335 Ill. App. 3d 41, 46, 779 N.E.2d 461, 465 (1st Dist. 2002) (repudiation occurs when one party to a contract clearly manifests "that it will not render the promised performance when it becomes due"); 10 Corbin on Contracts § 53.12 (2018) (repudiation may occur "even though there may be a large part of [a party's] promised performance that is not yet due").

Here, the SSA provisions requiring Defendant to track its time and to provide updates at Plaintiff's request can fairly be described as continuous. (*See* SSA at 3–4.) Both requirements either continue through the duration of the agreement (tracking time) or are repeated (providing updates upon request). *See, e.g.*, *Skinner*, 723 F. Supp. at 54 (in agreement to pay commissions on sales over a period of time, each failure to pay a commission triggered a new limitations period); *Thread & Gage Co. v. Kucinski*, 116 Ill. App. 3d 178, 184, 451 N.E.2d 1292, 1296 (1st Dist. 1983) (each breach of an installment payment agreement accrues separately). Defendant also appears to treat the SSA as such by relying on continuous-contract cases to make its limitations argument. (*See* Mem. at 3 (quoting *Hassebrock*, 2015 IL App (5th) 14003); Reply at 2 (quoting *Hassebrock* and *Hi-Lite*, 11 F.3d. 1402).) Thus, each failure to track time or to update Plaintiff on the project's progress would initiate a distinct limitations period, without causing all claims to accrue at once.

In addition, the earliest of Plaintiff's alleged breaches that could be considered "total," "material," or a "repudiation" would have occurred on or about May 24, 2017, when Defendant purportedly informed Plaintiff that it would not complete the Sage X3 ERP installation without additional paid consulting time. (Compl. ¶¶ 43–44.) *See Vill. of Fox Lake*, 178 Ill. App. 3d at 900, 534 N.E.2d at 141 (a material breach is one that defeats the objects of the parties or "renders performance of the rest of the contract different in substance from the original agreement"). Only at that point did it become plain that Defendant might not complete the core

work of the contract, which was to install the ERP software. By contrast, none of the previous alleged breaches involving timekeeping and client communication are so fundamental as to negate the purpose for which the parties contracted. Taking Plaintiff's allegations as true and drawing all reasonable inferences in Plaintiff's favor, the only plausible "total breach" or repudiation alleged in the complaint occurred on or about May 24, 2017, and Plaintiff's complaint is therefore timely as to the claims which post-date May 11, 2017.

Accordingly, Plaintiff's claim that Defendant did not properly track its time stemming from a communication on May 19, 2017 and Defendant's subsequent actions on or after May 24, 2017, are within the statute of limitations. (*See* Compl. ¶¶ 42–44.) Likewise, Plaintiff's tort claims both stem from the same alleged material breach on or about May 24, 2017 and are therefore also timely. (*See id.* ¶¶ 68, 78.) *See Hi-Lite*, 11 F.3d at 1410–11 (tort claims related to breach of a continuous contract are timely if the tort arises within the limitations period of a corresponding timely breach). However, any partial timekeeping breach alleged to have occurred before May 11, 2017, including the February 2017 communication from Defendant and any of Defendant's earlier dilatory responses, are time-barred. (*See* Compl. ¶¶ 36–40.)[3]

## II.     FRAUDULENT CONCEALMENT

Defendant moves to dismiss Count II of Plaintiff's complaint for fraudulent concealment. (Mot. at 2.) As relevant here, a fraudulent concealment claim in Illinois requires proof that a

---

[3] Plaintiff argues in passing that its earlier claims might survive through the discovery rule, which would extend the applicable limitations period for otherwise time-barred claims if Plaintiff could not have discovered the existence of those claims when the injury occurred. *See Hermitage Corp.*, 166 Ill. 2d at 77, 651 N.E.2d at 1135. (Resp. at 2.) The rule is inapplicable to Plaintiff's pre-May 11, 2017 contract claims, because Plaintiff demonstrates that it knew about Defendant's recordkeeping at the time. (*See* Compl. ¶ 39 (Plaintiff received communication from Defendant indicating lack of timekeeping on February 16, 2017); *id.* ¶ 38 (Plaintiff knew of Defendant's lack of communication and sent follow-up emails as a response in November 2016 and February 2017).)

defendant concealed a material fact with the intention to induce false belief under circumstances creating a duty to disclose. *Ruane v. Amore*, 287 Ill. App. 3d 465, 475, 677 N.E.2d 1369, 1377 (1st Dist. 1997); *Williams v. Chi. Osteopathic Health Sys.*, 274 Ill. App. 3d 1039, 1052, 654 N.E.2d 613, 622 (1st Dist. 1995). Defendant argues that Plaintiff fails to establish the existence of a special relationship requiring the duty to disclose and moves to dismiss Count II based on both Federal Rule of Civil Procedure 9(b), which requires pleading fraud with particularity, and Rule 12(b)(6) for failure to state a claim. (Mem. at 9–11, 13.)[4] Defendant also contends that Plaintiff's complaint does not sufficiently allege concealment of material facts. (*Id.* at 9, 11–12, 13–14.)

Not every omission will give rise to a fraudulent concealment claim; the tort requires a special relationship between the parties that triggers a duty to disclose. *Connick v. Suzuki Motor Co.*, 174 Ill. 2d 482, 500, 675 N.E.2d 584, 593 (Ill. 1996). A duty to disclose arises either when parties are in a fiduciary relationship as a matter of law, or when they share a special trust relationship, such that "plaintiff places trust and confidence in defendant, thereby placing defendant in a position of influence and superiority over plaintiff." *Id.* at 500, 675 N.E.2d at 593. Plaintiff concedes that it did not enjoy a fiduciary relationship with

---

[4] Plaintiff objects to analyzing the special relationship question under the specific pleading standard of Rule 9(b). (Resp. at 9.) Plaintiff asserts that Rule 9(b)'s particularity requirement is relaxed when pleading concealment of material facts. (*Id.* at 9.) This is true to a point, because where information was concealed from an innocent party, "it is unlikely that plaintiffs know the full extent of the deception or how it was achieved." *Fid. Nat. Title Ins. Co. of New York v. Intercounty Nat. Title Ins. Co.*, No. 00 C 5658, 2001 WL 477162, at *2 (N.D. Ill. May 3, 2001) (quoting *Towers Fin. Corp. v. Solomon*, 126 F.R.D. 531, 536 (N.D. Ill. 1989)). Plaintiff would have us extend this lower standard to allegations of a relationship giving rise to a duty to disclose. (Resp. at 9.) Even if this were the law, which we doubt, *see Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 571 (7th Cir. 2012) (appearing to apply Rule 9(b) to special relationship analysis); *Aeroground, Inc. v. CenterPoint Properties Tr.*, No. CIV.A 10 C 652, 2010 WL 2169493, at *4 (N.D. Ill. May 27, 2010) (same), Plaintiff must still plead a special relationship to state a claim. Under either standard, our conclusion here is the same.

Defendant, but argues that its complaint establishes that the parties were in a special trust relationship. (Resp. at 11.)

In Illinois, "the standard for identifying a special trust relationship is extremely similar to that of a fiduciary relationship." *Benson v. Stafford*, 407 Ill. App. 3d 902, 912, 941 N.E.2d 386, 397 (5th Dist. 2010). "[S]tate and federal courts in Illinois have rarely found a special trust relationship to exist in the absence of a more formal fiduciary one." *Wigod*, 673 F.3d at 571. To establish such a relationship, "the defendant must be clearly dominant, either because of superior knowledge of the matter derived from . . . overmastering influence on the one side, or from weakness, dependence, or trust justifiably reposed on the other side." *Id.* at 572 (quoting *Miller v. William Chevrolet/GEO, Inc.*, 326 Ill. App. 3d 642, 657, 762 N.E.2d 1, 13 (1st Dist. 2001)). In other words, for there to exist a special trust relationship, "the defendant accused of fraudulent concealment must exercise overwhelming influence over the plaintiff." *Id.* at 572 (quotation omitted). Typical arm's-length transactions, without more, do not give rise to a special trust relationship necessary to sustain a claim for fraudulent concealment. *Williams-Ellis v. Mario Tricoci Hair Salons & Day Spas*, No. 05 C 5030, 2007 WL 3232490, at *8 (N.D. Ill. Nov. 1, 2007); *Miller*, 326 Ill. App. 3d at 657, 762 N.E.2d at 13–14; *Mitchell v. Norman James Const. Co.*, 291 Ill. App. 3d 927, 934, 684 N.E.2d 872, 879 (1st Dist. 1997); *see also* Black's Law Dictionary (10th ed. 2014) (defining "arm's-length" as relating to dealings between two unrelated parties of roughly equal bargaining power). "[A]symmetric information alone does not show the degree of dominance needed to establish a special trust relationship." *Wigod*, 673 F.3d at 573. In a dispute between two businesses, Illinois courts have considered factors such as differences in business experience between the parties, "the extent to which the allegedly servient party entrusted the handling of

her business affairs to the dominant party, and whether the dominant party accepted such entrustment." *Id.* at 571.

Plaintiff argues that its complaint contains facts showing that Defendant exercised the overwhelming influence requisite to establish a special trust relationship. (Resp. at 10–13.) Plaintiff alleges that Defendant holds itself out as an expert in helping small- to mid-size manufacturers implement ERP software. (Compl. ¶¶ 8, 10.) Plaintiff quotes self-promotional statements from Defendant's website that Defendant provides "the perfect blend of practical business know-how," "proven technology expertise," and "personnel with advanced degrees," allowing customers to "rely on our collective business problem solving experience." (*Id.* ¶¶ 12, 13.) Defendant "repeatedly assured" Plaintiff that it could implement ERP software to meet Plaintiff's stated needs and knew Plaintiff was relying on Defendant's expertise in selecting, preparing for, and implementing the ERP software. (*Id.* ¶ 18.) Plaintiff avers it agreed to purchase Defendant's consulting package based on assurances that 55 days of consulting time would be sufficient to fully implement the software package and "to meet Plaintiff's stated needs and objectives." (*Id.* ¶ 27.) Plaintiff also claims, in conclusory fashion, that Defendant "possessed superior knowledge and influence over" Plaintiff regarding ERP software use and implementation. (*Id.* ¶ 62.)

None of these allegations point to a relationship of "overmastering influence on the one side, or . . . weakness, dependence, or trust justifiably reposed on the other side." *Wigod*, 673 F.3d at 572. Plaintiff's allegations instead reveal that Defendant exerted no more influence over Plaintiff than exists in a typical business transaction. Plaintiff concedes that the parties were connected through a referral, (Compl. ¶ 15), so no prior business dealings existed to induce elevated reliance. *See Magna Bank of Madison Cty. v. Jameson*, 237 Ill. App. 3d 614, 619,

14

604 N.E.2d 541, 545 (5th Dist. 1992) (considering no prior relationship between parties in rejecting fraudulent concealment claim). When Plaintiff first approached Defendant, the parties "had a number of discussions . . . regarding the scope of the ERP project, DreamPak's goals and needs, and InfoData's qualifications and experience with ERP software systems and the Sage X3 system, in particular." (Compl. ¶ 15.) Prior to contracting, Plaintiff "met with InfoData and made it aware of DreamPak's requirements . . . in light of its business needs." (*Id.* ¶ 16.) Based on Defendant's assurance that it could do the work, Plaintiff "agreed to purchase the Sage X3 ERP system" and associated consulting services from Defendant. (*Id.* ¶ 19.) Nowhere in these allegations can be found claims that Defendant's experience was so overwhelming as to induce Plaintiff's trust. Rather, "[t]he parties operated at arm's length." *Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601, 614 (7th Cir. 2013); *see also Williams-Ellis*, 2007 WL 3232490, at *8 ("Illinois courts have consistently held that arms'-length business transactions . . . generally do not give rise to a 'special relationship' and concomitant duty to speak."); *Miller*, 326 Ill. App. 3d at 657, 762 N.E.2d at 13–14 (arm's-length transaction between a customer and a car dealer, without more, cannot trigger a duty to speak). Plaintiff has therefore failed to plead the existence of a special trust relationship with Defendant.

Plaintiff's reliance on *Schraeger v. N. Cmty. Bank*, 328 Ill. App. 3d 696, 767 N.E.2d 376 (1st Dist. 2002), is misplaced. (*See* Resp. at 12–13.) Plaintiff discusses *Schraeger* not to argue that its allegations are similar to the facts of that case, but to demonstrate that it is *possible* for an arm's-length business transaction to give rise to a duty to disclose, and to argue that such determinations are inappropriate at the pleading stage. (*Id.* at 13.) Although *Schraeger* found a triable issue of fact on the special trust relationship issue, courts are cautious not to elevate routine contract disputes to charges of fraud without good reason. *E.g.*, *Benson*,

407 Ill. App. 3d at 913, 941 N.E.2d at 397 ("[W]here parties capable of handling their business affairs deal with each other at arm's length, and there is no evidence that the alleged fiduciary agreed to exercise its judgment on behalf of the alleged servient party, no fiduciary relationship will be deemed to exist."); *Mitchell*, 291 Ill. App. 3d at 934, 684 N.E.2d at 879 ("Although. . . courts have found that an action may lie even in the absence of a fiduciary relationship, the parties in such situations must have engaged in more than a mere arm's length transaction." (citations omitted)).  As we have explained, Plaintiff's allegations of the contract and circumstances surrounding it do not bear the hallmarks of "overwhelming influence" that the court in *Schraeger* found to be a triable issue of fact.  Plaintiff's complaint instead suggests nothing beyond a typical contractual relationship that failed to pan out.[5]

Accordingly, Count II of Plaintiff's complaint is dismissed without prejudice.

---

[5] Beyond an absent duty to disclose, it is at best dubious whether the complaint sufficiently alleges other elements of a fraudulent concealment claim.  Regarding the requirement to allege concealment of materials facts, *Ruane*, 287 Ill. App. 3d at 475, 677 N.E.2d at 1377, Plaintiff claims that Defendant concealed a need to stagger the work, "any problems or difficulties" with implementation, or an "inability or unwillingness to implement ERP consistent with [Plaintiff's] stated needs and the parties' agreed Scope of Work." (Compl. ¶¶ 69–71.)  But as Defendant points out, the SSA expressly disclaimed Defendant's adherence to any estimated deadlines or completion dates when the parties executed it.  (Reply at 10; SSA at 4.)  Fraud also requires scienter, *see Ruane*, 287 Ill. App. 3d at 475, 677 N.E.2d at 1377 (concealment must be "intended to induce false belief"), and Plaintiff gives little indication in its complaint that Defendant *knew* that it would not be able to perform as Plaintiff wished.  Stated differently, Plaintiff's claim is essentially that Defendant made a false promise to provide software.  "[T]he fact that a party breaks a contract doesn't show that its promise to perform it had been fraudulent when made— that is, that the party had never intended to perform it." *BPI Energy Holdings, Inc. v. IEC (Montgomery), LLC*, 664 F.3d 131, 136–37 (7th Cir. 2011); *see also Zaborowski v. Hoffman Rosner Corp.*, 43 Ill. App. 3d 21, 25, 356 N.E.2d 653, 656 (2d Dist. 1976) ("It is not enough, however, that the party make a false promise not intending to keep it; the total facts must show a scheme or device to defraud.")  Without more, we cannot say Plaintiff's claim passes muster on the present allegations.

### III.    NEGLIGENT MISREPRESENTATION

Defendant moves to dismiss Count III of Plaintiff's complaint, arguing that negligent misrepresentation requires heighted pleading under Rule 9(b), and that Counts II and III are duplicative.  (Mot. at 2.)  Defendant also moves to dismiss arguing that Plaintiff cannot maintain a negligent misrepresentation claim for purely economic damages under Illinois' *Moorman* Doctrine.  (*Id.* at 2; Mem. at 5.)

#### A.    Pleading Standard and Duplicative Claims

As a preliminary matter, we consider Defendant's argument that the heightened pleading standard under Federal Rule of Procedure 9(b) applies to Plaintiff's Count III for negligent misrepresentation.  (Mem. at 7–8.)  The Seventh Circuit does not apply a heightened pleading requirement to state-law negligent misrepresentation claims.  *Tricontinental Indus., Ltd. v. PricewaterhouseCoopers, LLP*, 475 F.3d 824, 833 (7th Cir. 2007) (negligent misrepresentation claim under Illinois law "is *not* governed by the heightened pleading standard of Rule 9(b)").  It is well established that the particularity requirement applies only to allegations of fraud, and "negligent misrepresentation claims are outside the scope of Rule 9(b)." *Fraud Fid. Nat'l Title Ins. of N.Y. v. Intercounty Nat'l Title Ins.*, 161 F. Supp. 2d 876, 887 (N.D. Ill. 2001) (citing *Marcano v. Northwestern Chrysler–Plymouth*, 550 F. Supp. 595, 603 (N.D. Ill. 1982)); *see also Siegel v. Shell Oil Co.*, 480 F. Supp. 1034, 1041 (N.D. Ill. 2007) (observing Rule 9(b) applies to fraudulent but not negligent misrepresentation because the purpose of Rule 9(b), to protect a defendant's reputation, is more applicable in allegations of intentional misrepresentation).

We also reject Defendant's argument that Counts II and III are duplicative. (*See* Mem. at 8.)  Claims are duplicative if they involve "the same operative facts, the same

injury, and require proof of essentially the *same elements*." *Beringer v. Standard Parking O'Hare Joint Venture*, No. 07 C 5027, 2008 WL 4890501, at *4 (N.D. Ill. Nov. 12, 2008) (emphasis added). In Illinois, fraudulent concealment requires "concealment [that] was *intended* to induce false belief." *Ruane*, 287 Ill. App. 3d at 475, 677 N.E.2d at 1377 (emphasis added). Negligent misrepresentation, on the other hand, requires "*carelessness* or *negligence* in ascertaining the truth of the statement." *Quinn v. McGraw-Hill Cos.*, 168 F.3d 331, 335 (7th Cir. 1999) (emphasis added). Since fraudulent concealment requires intent while negligent misrepresentation requires only negligence or carelessness, the claims are not duplicative. *See, e.g.*, *Freedom Mortg. Corp. v. Burnham Mortg., Inc.*, 720 F. Supp. 2d 978, 992 (N.D. Ill. 2010) (declining to dismiss as duplicative claims for negligence and negligent misrepresentation "because the elements" of the two torts "are materially different under Illinois law"); *Kopley Grp. v. Sheridan Edgewater Props., Ltd.*, 376 Ill. App. 3d 1006, 1017, 876 N.E.2d 218, 228 (5th Dist. 2007) (considering both fraudulent and negligent misrepresentation, acknowledging different mental states).

### B. *Moorman* Doctrine

We now turn to Defendant's argument that Count III should be dismissed under Illinois' *Moorman* Doctrine, which bars recovery in tort for purely economic damages. (Mem. at 5.) *See Moorman Mfg. Co. v. Nat'l Tank Co.*, 91 Ill. 2d 69, 88, 435 N.E.2d 443, 451–52 (Ill. 1982). Plaintiff does not contest that it seeks only economic damages. (*Id.* at 4–7.) However, Plaintiff argues that its claim falls into an exception to the *Moorman* Doctrine, which allows recovery for pure economic loss "where the plaintiff's damages are proximately caused by a negligent misrepresentation by a defendant in the business of supplying information for the guidance of others in their business transactions." *In re Chi. Flood Litig.*, 176 Ill. 2d 179, 199,

680 N.E.2d 265, 275 (Ill. 1997) (citing *Moorman*, 91 Ill. 2d at 89, 435 N.E.2d at 452).

(Resp. at 5.)

"Case law instructs that the Court must make a precise, case-specific analysis to determine whether a defendant was in the business of supplying information." *ABN AMRO, Inc. v. Capital Int'l Ltd.*, 595 F. Supp. 2d 805, 852 (N.D. Ill. 2008). Courts have generally separated businesses into three categories to apply the "supplying information" exception: "(1) businesses that supply only non-informational goods or services, where any information supplied is incidental to the sale of the product; (2) businesses that supply information as well as non-informational goods or services; and (3) businesses that provide a product consisting solely of information." *Id.* (citing *Hotel Emps. & Rest. Emps. Int'l Union Welfare Fund v. Sav-Rx*, No. 07 C 0916, 2007 WL 1423863, at *2 (N.D. Ill. May 10, 2007)); *accord Gen. Elec. Capital, Corp. v. Equifax Servs., Inc.*, 797 F. Supp. 1432, 1442 (N.D. Ill. 1992). For businesses in the first category, "the information supplied is merely ancillary to the sale of a product," and the negligent misrepresentation exception to the *Moorman* Doctrine does not apply. *First Midwest Bank, N.A. v. Stewart Title Guar. Co.*, 218 Ill. 2d 326, 339, 843 N.E.2d 327, 334 (Ill. 2006) (citing *Fireman's Fund Ins. Co. v. SEC Donohue, Inc.*, 176 Ill.2d 160, 168, 679 N.E.2d 1197, 1202 (Ill. 1997)). By contrast, the *Moorman* Doctrine allows recovery against businesses in the third category. *ABN AMRO, Inc.*, 595 F. Supp. 2d at 852–53 (listing accountants, inspectors, title insurers, and real estate brokers as examples). "Between these two extremes lie the more difficult cases, involving defendants whose business it is to provide both tangible goods (or other non-informational goods or services) *and* information." *Id.* (quoting *Rankow v. First Chi. Corp.*, 870 F.2d 356, 364 (7th Cir. 1989)). In this middle category, a claim falls into the *Moorman* exception "when the information furnished was 'an important part of the

product it offered,'" *Hotel Emps.*, 2007 WL 1423863, at *2 (quoting *Rankow*, 870 F.2d at 365), and the information was used for the guidance of the recipient or others in its business dealings. *Fireman's Fund Ins. Co.*, 176 Ill. 2d at 165–66, 679 N.E.2d at 1200; *see also ABM AMRO, Inc.*, 595 F. Supp. 2d at 853 (referring to the middle category as "hybrid businesses").

Software is considered a non-informational product that falls squarely into the *Moorman* Doctrine's bar on pure economic recovery. *MW Mfrs., Inc. v. Friedman Corp.*, No. 97 C 8319, 1998 WL 417501, at *5 (N.D. Ill. July 21, 1998) (finding Illinois courts have "consistently found that computer systems, including software, are 'tangible items' to which the *Moorman* doctrine applies" and collecting cases). Plaintiff thus concedes that its license for the Sage X3 ERP package is a non-informational tangible good, and further states that software support services are likely ancillary to the provision of the software. (Resp. at 6.) However, Plaintiff contends that Defendant's other consulting services "are far more akin to information services than a tangible good," which would place Defendant's business into the second category of businesses that supply both information and non-informational goods and services. (*Id.* at 6.) *See ABN AMRO, Inc.*, 595 F. Supp. 2d at 852.

*MW Manufacturers, Inc. v. Friedman Corp.*, 1998 WL 417501, upon which Defendant heavily relies, closely resembles the facts as alleged by Plaintiff and is highly persuasive. (*See* Mem. at 6; Reply at 7–8.) In *MW Manufacturers*, the plaintiff desired a software package to integrate and manage its manufacturing business. 1998 WL 417501, at *1. The plaintiff wanted the software to perform several tasks, such as "scheduling, inventory turns, capacity utilization, and future resources planning." *Id.* After the defendant responded to the plaintiff's request for proposal and made certain representations about the software's capabilities, the plaintiff chose the defendant to provide the software. *Id.* The parties signed two contracts, one which provided

a license to use computer programs and assessed related setup fees, and the other, a "Professional Services Agreement," which would retain the defendant to provide, "without limitation, technical and user training, project management, business planning, and software design and programming." *Id.* at *2. After the software failed to function as represented, the plaintiff sued, alleging negligent misrepresentation. *Id.* at *3. The court analyzed the claim under the *Moorman* Doctrine, and found that the "supplying information" exception did not apply because the information sought from the defendant was incidental to the software at the heart of the contract. *Id.* at *4–5. The court explained:

> The end result that Plaintiff sought was a product (a software package) with certain identifiable capabilities. To the extent that Plaintiff sought advice or information, that advice or information was incidental to Plaintiff's end result—the product. None of the advice or information sought or given in this case relates to anything *other* than Plaintiff's desired end result of the product. Accordingly, Defendant was not in the "business of supplying information," and, thus, Plaintiff's negligence and professional malpractice claims (Counts III and IV) fail.

*Id.* at 5.

Striking similarities emerge when comparing the facts of the present case to *MW Manufacturers*. Here, Plaintiff and Defendant executed two agreements, both subject to a "Software Services Agreement." (Compl. ¶¶ 20–22, 25–26; SSA at 4.) Plaintiff paid one fee for the items described in a "Software Services Description," which included a license for the Sage X3 ERP software with specified modules and one year of software support. (Compl. ¶ 21–24; SSA at 2.) This first agreement mirrors the license and setup fees in the first agreement between the parties in *MW Manufacturers*. *See MW Mfrs., Inc.*, 1998 WL 417501, at *2.

More importantly for the "supplying information" analysis, here Plaintiff also retained Defendant to provide other consulting "services," specified in a Letter of Understanding, for an

additional fee.  (*See* SSA at 3.)[6]  But the consulting as described concerned effective installation of the software.  Plaintiff states that Defendant's "application consulting" would include "Sage X3 installation, project management, and training."  (Compl. ¶ 25.)  Plaintiff claims that it purchased 55 days of consulting services because this amount "would be sufficient to fully implement the Sage X3 Software" to Plaintiff's specifications.  (*Id.* ¶ 27.)  Defendant's services would include, but not be limited to, "Project Management to assist in setting up work plans, attending meetings," informing Plaintiff's management of the project status, and "Manufacturing and Financial Consulting that will assist [Plaintiff] in applying Sage X3" to its business.  (SSA at 3.)  When Defendant commenced work, it evaluated Plaintiff's business to "provide guidance for DreamPak's implementation and use of ERP [software]."  (Compl. ¶ 31.)

All of these agreed-upon services match nearly exactly those that were described in *MW Manufacturers*, which the court found to be ancillary to the software provided.  *See MW Mfrs., Inc.*, 1998 WL 417501, at *2 (describing contract for "technical and user training, project management, [and] business design").  Although there are some differences between the agreements (*e.g.*, Plaintiff's consulting services expressly excluded programming, (SSA at 3), while the agreement in *MW Manufacturers* included programming, 1998 WL 417501, at *2), in both cases, "[n]one of the advice or information sought or given . . . relates to anything *other* than Plaintiff's desired end result of the product."  *Id.* at 5.  Plaintiff argues that the "Manufacturing and Financial Consulting" portion of Defendant's services constituted "an important, specialized, and distinct part of the overall package" that Defendant offers its

---

[6] The SSA defines "Services" as "other services as reasonably requested and directed by Client which are associated with the installation and use of data processing products, including but not limited to special studies, system analysis and design, and application design, development, and programming."  (SSA at 4.)

customers, (Resp. at 6), but Plaintiff does not distinguish these services in any real way from the "business planning" in *MW Manufacturers*, 1998 WL 417501, at *2. Plaintiff also cites Defendant's website, which advertises its consulting as "a key complement to the software packages" it provides, (Resp. at 6–7), but Plaintiff's complaint tends to allege that these services were all geared toward installing and implementing the software. (*See, e.g.*, Compl. ¶¶ 25, 27.) Given the similarities between Plaintiff's complaint and the facts as alleged in *MW Manufacturers*, Defendant fits most naturally within the first category of business, in which information supplied is only incidental to delivering the ultimate software product.

Even if we were to characterize Defendant's business as a "hybrid" that supplies both information and noninformational goods and services, Plaintiff's complaint does not sufficiently show that the information Defendant provided was "an important part of the product it offered" and was used to guide Plaintiff's business dealings beyond its use of the Sage X3 software. *Hotel Emps.*, 2007 WL 1423863, at *2; *Rankow*, 870 F.2d at 365 (analyzing hybrid or "mixed" cases to determine whether information was "an important part of the product provided"). Plaintiff's complaint at Count III attempts to paint Defendant's business as one that supplies information through its consulting services, "including floor evaluations, business process evaluations, cost and financial analyses, and other services intended to assist manufacturers in improving their business processes." (Compl. ¶ 75.) But all the harm that allegedly resulted from Defendant's misrepresentations has to do with the software Plaintiff desired, not with any information Defendant would have provided about Plaintiff's business practices. (*Id.* ¶¶ 77–79.) Plaintiff complains about information Defendant offered "regarding the implementation and use of ERP Software" and alleges Defendant misrepresented that the "Sage X3 ERP software, as implemented by InfoData, would include the features required" by Plaintiff and "would not

include certain of the modules or features necessary to make best use of" it. (*Id.* ¶¶ 77–78.) Plaintiff's claim reduces to Defendant's failure "to implement the ERP program, and all required features, in accordance with the parties' agreed specifications and scope of work." (*Id.* ¶ 79.) None of these allegations show that the information Plaintiff contracted with Defendant to supply was "an important part of the product" Defendant was selling. *Hotel Emps.*, 2007 WL 1423863, at *2. The allegations instead focus on "Plaintiff's desired end result of the [software] product." *MW Mfrs., Inc.*, 1998 WL 417501, at *5.

Plaintiff argues that the foregoing inquiry is "fact-intensive and unsuitable for the pleadings stage." (Resp. at 6.) While the *Moorman* Doctrine and its exceptions require a case-by-case analysis, we do not find that Plaintiff's allegations, purely on the face of the complaint, allege that Defendant was in the business of supplying information beyond that incidental to installing and implementing software. Moreover, we are far from the first court to undertake this analysis at the motion to dismiss stage. *See, e.g.*, *ABN AMRO, Inc.*, 595 F. Supp. 2d at 816; *Hotel Emps.*, 2007 WL 1423863, at *1; *MW Mfrs., Inc.*, 1998 WL 417501, at *1; *Fireman's Fund Ins. Co.*, 176 Ill. 2d at 161, 679 N.E.2d at 1198.

For these reasons, we find that Plaintiff has failed to allege that Defendant was in the business of "supplying information," and Count III of Plaintiff's complaint is therefore barred by application of the *Moorman* Doctrine. We dismiss Count III without prejudice.

## IV.     MOTION TO STRIKE

Finally, Defendant urges us to strike portions of the Plaintiff's complaint as "redundant, immaterial, impertinent, or scandalous" under Federal Rule of Civil Procedure 12(f). (Mem. at 14–15.) "Motions to strike under Federal Rule 12(f) are not favored and are usually denied unless the language in the pleading has no possible relation to the controversy and is

clearly prejudicial." *Simmons v. John F. Kennedy Med. Ctr.*, 727 F. Supp. 440, 442

(N.D. Ill. 1989). "Prejudice results when the matter complained of has the effect of confusing

the issues or where it is so lengthy and complex that it places an undue burden on the responding

party." *Anderson v. Bd. of Educ. of City of Chi.*, 169 F. Supp. 2d 864, 868 (N.D. Ill. 2001).

Motions to strike "are generally disfavored because they potentially only delay the proceedings."

*Edwards v. Mack Trucks, Inc.*, 310 F.R.D. 382, 386 (N.D. Ill. 2015). The moving party has the

burden of showing that the challenged allegations "are so unrelated to plaintiff's claim as to be

devoid of merit, unworthy of consideration, and unduly prejudicial." *E & J Gallo*

*Winery v. Morand Bros. Beverage Co.*, 247 F. Supp. 2d 979, 982 (N.D. Ill. 2003) (internal

quotations omitted).

Defendant first seeks to strike a document captioned Executive Summary and a

preliminary draft of the SSA, both appended to the copy of the SSA that Plaintiff attached to its

complaint. (Mem. at 14–15; SSA at 8–10.) Both documents, constituting three total pages, are

arguably related to Plaintiff's claims, and in any event, neither of them prejudice Defendant as

they do not confuse the issues or play a pivotal or even incidental role in the analysis above. *See*

*Simmons*, 727 F. Supp. at 442; *Anderson*, 169 F. Supp. 2d at 868. Defendant's motion is denied

as to these two documents.

Defendant also moves to strike paragraph 59 of the complaint and Plaintiff's request for

attorney fees as immaterial because they reference Plaintiff's entitlement to damages that

Defendant argues are precluded by the SSA. (Mem. at 15.) Defendant's motion invites us to

engage in contractual interpretation that is premature at this stage. *See Ronald McDonald House*

*Charities of Chicagoland & Nw. Ind., Inc. v. Winning Charities Ill., LLC*, No. 13 C 1430,

2014 WL 1480750, at *3 (N.D. Ill. Mar. 24, 2014) (declining to strike request for liquidated

damages at the motion to dismiss stage as premature); *Cent. Dupage Health v. 3M Co.*,

No. 05 C 0241, 2005 WL 2848396, at *4 (N.D. Ill. Oct. 26, 2005) (denying motion to strike

damages because it was "based on the interpretation of the contract, which is inappropriate at this

stage of the litigation").  Defendant's motion to strike paragraph 59 of the complaint and

Plaintiff's request for attorney fees is denied.

## CONCLUSION

For the foregoing reasons, we grant in part Defendant's motion to dismiss Count I for

breaches of contract that occurred before May 11, 2017, and deny Defendant's motion in part for

breaches occurring after May 11, 2017.  We grant Defendant's motion to dismiss Counts II and

III, without prejudice.  Defendant's motion to strike is denied.  It is so ordered.


_____
Marvin E. Aspen
United States District Judge


Dated: January 8, 2019
      Chicago, Illinois